The next case for argument is Solomon v. Cutler. Mr. Silvestri. May it please the Court, I am James Silvestri. And you are sharing your time with counsel for Art Loss Register, is that right? That's correct, Your Honor. So what, how do you, and do you intend to have any rebuttal time? I would like to reserve some time for rebuttal. We've allotted, agreed, five minutes for ALR. Okay. My name is Mr. Rugg, which will leave me with 15 minutes, and I would like to allot five minutes for rebuttal, but I'll keep an eye on the clock, Your Honor. All right. Thank you. You may proceed. Thank you, Your Honor. Before you get too far, and I know you've just really gotten into this, but it's a, I, we've got a lot of evidentiary questions you're going to talk about, but I'd be very interested in knowing what interest does your client even have in this painting? As I understand it, it was stolen. It was paid $20,000 from the insurance company. Therefore, his rights were subrogated. The insurance company later settled. When the painting was sold again, your client got a piece of that after the insurance company was reimbursed. What rights does he have? I mean, we don't even get to the evidentiary issues, do we, unless your client has some standing, some financial claim to which he can make a reference here. To rely on, or to reach that conclusion, Your Honor, one has to, must rely on the evidentiary issues. Also, in other words, you're saying that the scenario that I described is not in the taint of bad rulings. Is that right? That is absolutely correct. Okay. And the evidentiary rulings here, in large part, are tied up in the FBI teletypes, correct? Tied up in the FBI teletypes, which are approximately 14 pages of a much larger production made by the FBI, and in addition, according to the district court, testimony by a gentleman named David Fine. Correct. And as I understand it, these teletypes are under seal, is that correct? Presently, I'm not certain, but they certainly were under seal during the time of the trial. Right. And since we don't know any differently, we'll talk here about the teletypes in principle, but I don't think that the details of them are relevant to the evidentiary ruling. I'll do my best to refrain from that, Your Honor. Although I understand there's some constraint. Thank you. Again, just before you go, I want to be sure, so you're saying that the fact that Mr. Solomon received $20,000 from the insurance company is not independently verifiable other than the evidence that we're talking about here, is that correct? That, in part, is correct. He did not deny that he received monies from an insurance carrier back in 1973. That insurance carrier, though, subsequently withdrew any rights that it had to the painting, did not exercise any subrogation rights, and, in fact, allowed Mr. Solomon to proceed forward. But that doesn't give them back to your client, does it? It does, Your Honor. The insurance carrier never subrogated to those rights, never went into Mr. Solomon's shoes. Otherwise, we would say it was paid, was it not? And, again, my question to you is, when the auction took place, your client, and the question I want to ask is, is there evidence in this case that doesn't come from Mr. Fein, or the other disputed evidence, or the FBI transcript, is there evidence that shows that your client entered into an arrangement by which the insurance company got back its money, and your client got 10% of everything left over, I guess it was one other cosign, or is that evidence, does that come from just the contentious area, or is that independently verifiable? There's no independent verification, and I apologize if I misspoke. The money that I spoke about, that Mr. Solomon received, was in 1973, 15 years before any auction. And I understand that. Okay. So in answer, and I apologize if I misspoke, but in answer to your question, 1988, with respect to the auction that took place in New Orleans, there is no independent verification of any of the facts that are contained in the teletypes, with the exception of the other hearsay problem that we have in this case, that being the testimony of David Fein. Is that the Louisiana Purchase Auction, so aptly named? It was named the Louisiana Purchase Auction, and it was a once-a-year auction that was held at an antique auction house known as the Goldberg Auction House, or the Goldberg Antiques. Your Honor, it is our position that a district court abuses his or her discretion when he reaches or she reaches a decision that is either illogical, implausible, or without the support of inferences that can be drawn from the evidence. And the two instances that we believe where the court abused discretion was in the testimony of David Fein. We also believe that the court abused its discretion with respect to its choice of law issues, which affect the statute of limitations. The district court stated in its findings, the FBI reports most clearly demonstrate Solomon's knowledge of consent to and profit from the sale of the painting. The district court went on to say that David Fein's testimony regarding Morton Goldberg's statements at the auction preview also corroborates the contents of the FBI reports. It was those two bits of testimony upon which the district court solely relied, we believe, or contends solely relied in awarding the painting to Ms. Cutler. Solomon objected to both the admission of the FBI teletypes as well as David Fein's testimony. We believe that if this evidence was not admitted, there would be no logical and no plausible way that the district court could have reached the conclusion that it did. There are exceptions to the hearsay rule which the district court relied upon in admitting the FBI teletypes. However, it is our contention that these exceptions to the hearsay rule do not apply. The first exception upon which the district court relied was 8038, public records and reports exception. However, in the Oriana Blanco case submitted by this court in 2002, the court noted that this exception applies to what, and I quote, the sundry sorts of public documents for which no serious controversy ordinarily arises about their truth. The court said that these types of documents are typically raised in a non-adversarial setting. They are ministerial type of documents. This court also in 1991, in the Chuck, excuse me, the Chu Kung Yin case, said that the documents have to be such or relate to an event to which the author, him or herself, could testify. The problems that we have with the FBI. Excuse me, counsel. I want to be sure we're in agreement here. The cases you've cited were criminal cases, were they not? They were. But that totally changed the basis upon which we review this. This is a civil case. It is a civil case, but we're still dealing with the Federal Rules of Evidence. And in this case, so in the last case that we cited to, or the problem that we have, where we need documents to which the author, him or herself, could testify to, we have no author. In these 13 pages that were, or 14 pages of a much larger production submitted by the FBI, I would submit they're the only documents for which there's no author identified. We have proof of that also from general counsel or associate general counsel from the FBI, who stated, we do not know who prepared these documents. Further, we don't know to whom the documents were submitted. If you go through the entirety of the FBI documents that were submitted on this issue, approximately 150 pages, we have identities of authors and identities of recipients. Counsel, when you say that the business records are normally non-controversial, isn't it true that business records most of the time are not controversial until something happens later that makes them controversial? Isn't that usually the case? I believe that the records to which the Court is referring to in the Oriana Blanca case are things like birth certificates, records that are kept, property records. This is definitely controversial, Your Honor, because we're dealing with an FBI investigation which is adversarial in its, I mean, on its face it's adversarial. Counsel, we get cases all the time in the immigration area where there's, I forget what the form is called, something A, I forget the technical name of it, but talking about people coming in and out of the country and we rely on it all the time. It's a business record. They don't know who prepared it most of the time. It's just in the record, the A file or whatever it is. What's the difference between that and this concept here? Well, twofold, I believe. One is, I do not deal in the area of immigration, so if I misspeak, I apologize. But my suspicion would be that with some investigation, I could find out who authored that document. Perhaps that's true, perhaps it's not. But I believe that I would have an opportunity to discover who prepared that document and provide my client with a right of cross-examination, which I believe is a right inherent, whether it's a civil case or a criminal case. The second thing is that those documents probably refer to or identify names, addresses, phone numbers. In these documents, the only name that's identified is Mr. Solomon. The documents refer to attorneys, and they quote attorneys. They refer to a consigner couple, and they quote to a consigner couple. With respect to the statements that might have been made by Mr. Solomon, those would come in also on their separate admission against interest, would they not? The other rule relied upon by the district court was Rule 801, I think it was miscited in the order, but it's D-2, and what I called the party opponent admission. The problem with relying on that exception of the hearsay rule is, once again, we have no guarantees of trustworthiness of the statement because we don't know who allegedly interviewed Mr. Solomon. If, in fact, it was Mr. Solomon that was interviewed, and I say that because the records suggest, indicate that somebody was interviewed via telephone, and it was one interview. The other problem is that in that alleged interview, the interview is referring to statements made, again, by unknown attorneys, statements made by an unknown insurance carrier. We don't know what representations were made, and now we've drawn ourselves into another hurdle under the hearsay section. I realize, I think, you know, it's always troublesome when you have to go back so far in time, but one of the things in really looking at this kind of residual hearsay situation, as the district court did, I thought the district court was basically saying, look, we're 20 years back, we know these are FBI documents. Given what we have, this is the best evidence of what we have of that investigation. Why doesn't that really sum up the situation that we're in? Because I believe that the rule, Your Honor, still requires the equivalent circumstantial guarantees of trustworthiness. The fact that something might be the best evidence or the only evidence does not make it admissible. Do we credit the fact that this is the FBI at all, or does it cut the other way? We're at USD, I guess, maybe it depends. I don't know. I went to Santa Clara, I could tell you what it was 20 years ago. With all that aside, what really, frankly, if you look at the entirety of the FBI documents, the rest of the documents actually say FBI on them. These documents don't say, at the title page, FBI. The other documents have authors. I would expect more of the FBI. In fact, when you read the rest of the documents, you see that we've got the premier investigating agency in the world working on these documents. These 14 pages, though, somehow do not fall within that gamut. Because, as I said, we have no author, we have no recipient, but it goes deeper. I don't want to cut you off, but I did want to let you know that if you're going to give your colleague five minutes, you have three minutes left, so it's your choice. I'd like to move on, then, if I could. I do not believe that these documents were also properly authenticated. First of all, no witness testified at the trial with respect to the authentication. Authentication was allowed by the district court under Federal Rule of Evidence 902.11, namely... You have three minutes total left. Oh, I apologize. Just to make sure you understood what the timing was. I didn't want you to use it up, which you didn't want to. Your co-counsel's hands are becoming white. Very white. Your Honor, I'll rest, then. Thank you. Good afternoon. May it please the Court. My name is Gene Brocklin. Mr. Solomon's co-counsel is going to reserve his time and speak after me. I represent Judy Goffman Cutler, who is both the appellee and a cross-appellant in this matter. I'd like to reserve three minutes for rebuttal, if I could. I'd like to first correct a couple of things that were discussed with Mr. Silvestri. First of all, Judge McKeon, if I'm pronouncing your name right, with respect to the seal, the FBI documents were originally produced pursuant to an order out of the Eastern District of Missouri. It said the documents were produced under seal, but that order specifically left it to the district court to determine how the records would be dealt with at trial. When the issue came up at trial, the court said the seal is gone, these documents should be in the public record. Secondly, I want to correct another thing. Mr. Silvestri indicated that the only name in the FBI documents from back in 1973 was Jack Solomon. That was not true. There were names of Morton Goldberg at Goldberg Auction Galleries. He's since deceased. But that name was in there, and there was the name of Martin Diamond in those documents. Mr. Diamond, thankfully, is not deceased, and Mr. Diamond testified very credibly about calling Solomon's office and telling them that he had learned that the Russian schoolroom was up for auction. He talked about calling his friend, who was an FBI agent in New York, and telling her about it. And thereafter, not by coincidence, I would assert, you see these communications back and forth between the New York office, the St. Louis office, the Chicago office where Solomon resided, and the New Orleans office where the painting was going to be auctioned. Counsel, I should probably ask you the same question that I asked Mr. Silvestri. I ask him whether, based upon the evidence presented in the case, which is not contested in these appeals, there is evidence that Mr. Solomon was paid by an insurance company, I think it was $20,000, for his interest in the painting, that the insurance company and Mr. Solomon later on, at the time of the, I'll call it the Cotter auction, I don't know whether you'd call it that correctly, the Louisiana Purchase, we'll call it, that there was an arrangement whereby he and a, in quotes, cosigner would get 50% each of the amount above, or maybe it was 10%, I'm sorry, of the amount above what the insurance company was being repaid. Is there evidence to that effect that it's not affected by the evidentiary disputes that are before us? In part, yes. What part is it? The part that there's no dispute about, in fact, Jack Solomon acknowledged that when the painting was stolen in 1973, he was paid, his company was paid by the insurance company and he was ultimately paid the proceeds. Now, he couldn't remember if it was $15,000 or if it was $20,000, he wasn't sure about the deductible, but he acknowledged in his testimony that he was paid in 1973. And normally, normally, would that not end his rights in the painting? I believe, Your Honor, that that is often the case under the law, but I know in other instances that ultimately the insurance contract that was in place at the time would control and no one was ever able to locate that insurance contract. So to the extent that it was a matter of contractual obligation, we didn't know. So is your client assuming, is everybody assuming that that insurance contract that somebody can find gave Mr. Solomon a right to reenter into some element of ownership of the painting? Honestly, at this point, I don't know, but the court found that he was the owner as of 1988, so I guess the court was comfortable with the position. Nobody challenged that, we're stopped in effect, the courts found that. No, that's correct. And in fact, if you look at what happened later, it's consistent with the fact that he was paid in 1988 because Chubb ultimately waived his interest in the painting. Why would it waive its interest in a painting that had become much more valuable over the years if it hadn't gotten paid back in 1988? So the fact that the 1988 payment to Solomon is referred to in the challenged FBI documents is not the only evidence of that fact. So Chubb falls out. Pardon me? Chubb falls out of the picture. Correct. Spielberg falls out of the picture. Everybody fell out except Jack Solomon, who was paid once in 1973 and paid again in 1988, and Miss Cutler, who stepped into the shoes of Steven Spielberg by swapping a painting with him and took him out of the fray, and then it became a contest between those two. And obviously it's our position that she was absolutely a good faith purchaser in 1988. Furthermore, that Solomon effectively sold her the painting in 1988. That's what's really egregious here, is that he was paid not once, but twice, and then still tried to sue to get the painting back, and she was required to litigate with him in order to clear title to Russian Schoolroom, which she was entitled to after that 1988 auction. As to the FBI documents, we think they're absolutely admissible. They were properly authenticated under 901 and 902. We went to great lengths to see that they were authenticated under both of those rules. I think that the hearsay exceptions absolutely apply, whether they're as admissions of a party opponent. There are some of those. Public records, where you have activities of the FBI agents observing matters. They observed Russian Schoolroom in the window of the auction house. Any number of matters come in under the public records exception, and then, of course, the residual exception also. I thought the district court's analysis was sound, and the FBI documents should absolutely have been admitted into evidence in this case. Even if they had not, however, I think the result is still properly the same. First of all, a key finding of the court was that Jack Solomon lacked credibility. The district court had the opportunity to hear the evidence, to view the witnesses, and he found that Solomon's denial of the 1988 events in light of all the evidence was not credible. And there was a plethora of other evidence besides the FBI documents that supported the court's decision that indicated that Solomon knew about the 1988 auction, whether it was the Goldberg auction's publicity, whether it was Diamond's phone call, whether it was Fine's testimony, whether it was that the auction results were widely publicized afterwards. There were other matters involving Ms. Cutler's prominent advertising of the painting in 1989. She didn't buy it to keep it forever. She bought it to sell it, and she tried to sell it. And she advertised it for sale, and she advertised it in publications where it could easily be seen. And she offered it for sale to a contact in New York who happened to work for Solomon. And when she did that, she offered it to Mr. Podgorski. Mr. Podgorski didn't exhibit any interest, but he didn't exhibit any alarm either. You also had a couple of other people calling Jack Solomon to tell him about what was going on in 1988 and 1989. You had a reporter by the name of William Stage, and you had a former employee by the name of Mary Ellen Shortland who placed a call to Solomon, none of those calls being returned. And the logical inference is that there was no reason to return those calls. There was no reason for Podgorski to be alarmed about Russian schoolroom being for sale. For purposes of our consideration, what deference are we to give the district judge's finding that all of the normal rules to establish provenance were followed? I think the court is, I think the district court is entitled to deference on that issue. I think there's... It's a clear and convincing evidence. It's an abuse of discretion standard. And I think it's clear that the court did not abuse its discretion in making its findings. So we believe that the ownership issue is completely clear. Appellant Solomon also challenged the choice of law. He suggested it would make it matter on the statute of limitations. Would it matter to you? I don't believe that it matters because Solomon knew of the auction and consented to it, and so right then he lost the ability to challenge this. But on the statute of limitations, it could matter potentially if we believe that it was correct to apply Nevada law, and Nevada law says that if the facts were known or in the exercise of reasonable diligence could have been known, then the cause of action accrues. And we think all of the evidence that we describe shows that Solomon at the very least should have known, and therefore the cause of action accrued. And that's clear Nevada law, which we think is the appropriate law to apply and which the court applied. And it's proper to apply it because Nevada law, for one, is on statute of limitations. Nevada says it's procedural, not substantive. So you apply the law of a forum court, and that's what the court did. Now, Mr. Silvestri wants you to apply New York law, which we think has no basis under any analysis of choice of law principles for application. But frankly, in the end, we don't think it matters, even if you apply it. You still have a laches problem. You still have a laches problem, absolutely. And under the Guggenheim case out of New York, which they like to talk a lot about, the Guggenheim court made it clear that the laches problem still exists under any scenario. I'd like to turn, if I could, then, to Ms. Cutler's cross-appeal matters. First, on the defamation claim. Ms. Cutler alleged that she was defamed in an article that appeared in a Missouri newspaper called the Riverfront Times. The article was entitled The Purloined Rockwell, and Solomon was quoted in it saying, she should have known better, she could have checked that, there's been a record ever since the day it was stolen. That's an opinion, is it not, counsel? I think it's not, Your Honor, and that's what the district court decided, was that it was an opinion, but I think the court got it wrong there. And this court's review of the district court's decision there is a de novo review, because this was on summary judgment. Well, he said, I think. If he just said, she should have known, or she just stole this, or she just, something direct, that's a little bit different. But if it's qualified in some way, so that it's opinion, you would agree that if it's opinion, then there's no cause of action, right? Unless it's an opinion, I would agree, unless it's an opinion that alleges, that implies no cause of action, that implies nondisclosed defamatory facts. And I think that what we have here is Mr. Solomon was implying more than he said. And this court and the district court is entitled to look at those statements and see if more is implied than is strictly stated. And what he was, think about, let's think about what he was implying here. When he says, she could have known better, he means she could have known, or she should have known better. She should have known better than to buy that painting at auction because it was stolen. She should have known better than to sell that painting a year later to Steven Spielberg because it was stolen. He is implying that she is trafficking in stolen art. And in fact, a year later, he came out and said it in his pleadings. And I know that pleadings are privileged, but the fact that he says in a pleading later that Cutler was trying to unwind the effects of trafficking in stolen art, it's evidence of the fact that that's what he was implying when he made these statements a year prior to the press. I mean, I guess you have this odd situation where you don't have the art database registry until some years later, but there was a police report, correct? Although nobody seems to, somehow it went missing, also along with the painting? There was a police report made to the Clayton, which was the local community where it was stolen, the Clayton Police Department. But in fact, the very article in which Mr. Solomon was quoted, in that very article, the FBI people are quoted as saying that the local police report disappeared for years or disappeared for some period of time. And so Mr. Solomon saying she could have checked that, there's been a record of this since day one, was untrue. And that is certainly even closer to the truth. Is it necessarily untrue or just unclear, given there was a report, but somebody said, well, it's misplaced? It's true. I think when you say she could have checked that, there's been a record since the day it was stolen. No, there hasn't been a record since the day it was stolen. And the implication that somehow she could have known to contact the local Clayton, Missouri Police Department is a little bit ridiculous as well. So I think that what you see in the implications of the statements from Solomon is matters that in fact are defamatory when you charge somebody with trafficking in stolen art. Finally, we had another claim that was dismissed on summary judgment, and that was the intentional tort claim against Art Loss Register and against Solomon, with Art Loss Register being Solomon's agent in this matter. And there are three elements under New York law of the intentional tort claim. It's the intentional infliction of harm causing special damages without excuse or justification. And what we allege here is really two things that we believe ALR did that run afoul of the prohibition against intentional tort. And one is the threatening of an FBI investigation, and the other is the threatening of adverse publicity. And I want to focus just for now on the threatening of the FBI investigation. That is a matter that they want you to believe essentially that's all's fair in love and war and in discussions over ownership of a painting. And it was okay, even if they did threaten an FBI investigation, it was okay to do that, because it was prior to litigation, and therefore it was okay. But the fact is that that threat of an FBI investigation was made by Chris Marinello, who was then the general counsel of Art Loss Register. He's a New York lawyer, and the New York Code of Professional Conduct makes it perfectly clear that an attorney is not to threaten a police investigation in order to try to coerce a civil settlement, and therefore we think that an intentional tort occurred. I'd like to reserve the rest of my time. Good afternoon, Your Honor. As was just said, the Art Loss Register's role in this case is actually extremely limited. There's one claim against it, it's this intentional tort claim, it was dismissed on summary judgment. The district court granted summary judgment to ALR because it found that Ms. Cutler had presented no evidence of any damages, special damages or the damages she claims happened when she lost a client. In fact, that claim went out the window, in the word of her own husband, when Mr. Spielberg testified that he hadn't lost her as a client. The second part is the special damages part, they say they incurred attorney's fees. There was no evidence at all in the brief in opposition to our motion for summary judgment claiming any attorney's fees. There's no evidence of any invoices, there's no evidence of any billing, and in fact, all the attorney's fees that may have been incurred by Ms. Cutler's late attorney, Mr. Bressler, were related to, in fact, defending her against the FBI investigation of her that had, in fact, been going on since at least 2004. Now, our role in the case only happened at some point in 2007, somewhere between March and May. So when Ms. Cutler says that she was threatened with an FBI investigation, in fact, she was the subject of an FBI investigation that was not caused by ALR, predated our role in the case completely, and was resolved on the same day that Ms. Cutler and her representatives met with ALR. They met with my client on April 27th of 2007. That same afternoon, they met with the FBI, and the FBI agent, according to Ms. Cutler, told her that she was off the hook. The investigation was over. She would now have you believe, and she asked the district court to believe on pure inference that somehow she incurred attorney's fees later, on May 1st or on May 10th, because ALR then asked the question. Did not make a threat, and this is kind of significant in the way that this has been briefed. Ms. Cutler keeps talking about a threat, but she never talks about the actual language. If you want to look at the actual language of the statements, you have to look at the briefs presented by ALR. And the actual language of those statements, at least the two e-mails that were in evidence, is that ALR merely asked the question, general counsel of my client to Ms. Cutler's attorney, are you sure she's free of the FBI investigation? Now, Mr. Marinello, my general counsel, was not present at the April 27th meeting when Ms. Cutler met with the FBI. There's no way for him to have known that the FBI on that date told her she was off the hook. It was a legitimate question, it was not a threat, and it did not cause her to get any attorney's fees. And that's what the district court correctly found, that there's no evidence that she incurred any fees as a result of the two e-mails on May 1st or the alleged telephone conversation on May 10th. Going forward, as presented in our briefs, I'm going to try to reserve some of the five minutes I've taken from Mr. Silvestri to give back to him, but there are several other grounds on which the district court can be affirmed on this grant of summary judgment. We presented the idea of the judicial proceedings privilege. This is a strong privilege that's granted to parties when they're trying to negotiate a settlement or when they're involved in litigation. The law states that it goes to negotiations that preexist the actual occurrence of litigation. The litigation here started on May 15th, 2007, when Ms. Cutler brought her action in New York court, which she later dismissed in favor of the action in the District of Nevada. Under the judicial proceedings privilege, the district court could be affirmed. Additionally, we question whether Ms. Cutler has met all the elements of intentional tort. Ms. Cutler wants to get away from the disinterested malevolence standard that's required for the prima facie court or the tort of intentional tort, which is kind of a weird tort under New York law. The only difference between those two is the question of whether the action was legal or the action was illegal or corrupt. It doesn't change the original element. The original element is intentional infliction, and that original element has the standard of disinterested malevolence, which means that the only purpose of whatever bad act occurred would be to harm the defendant. That's not the case here, because the case here was clear that AOR was representing its client in trying to recover this piece of artwork. Its interest was its business justification. That will not get it to intentional tort. Thank you. You may have the remaining time. Thank you, Your Honor. With respect to the FBI documents, there are other names mentioned, but the only person who allegedly was interviewed was Mr. Solomon himself, and so this has a compounded problem under Rule 805. In other words, there are references made by an agent who he attributes statements made by attorneys and by somebody named Morton Goldberg, but the question that has to be asked if these documents should be relied upon, why didn't the FBI talk to Mr. Goldberg? Why didn't the FBI talk to the attorneys? Why didn't they talk to an insurance carrier? And the question then comes down to us, in fairness, why didn't we get a chance to talk to the FBI agent that did the interview or talk to the parties to which these reports or teletypes refer? Counsel, I appreciate your concern. When we review the district court's rulings here, the standard is abusive discretion, is it not? It is, Your Honor. A very difficult standard for you to overcome, and that's why we don't see all that many civil evidentiary issues. What specific fact or facts would you like us, when we undertake our deliberations, would you want us to focus on that will enable you, in your view, to overcome the abusive discretion standard by which we review the district court's evidentiary rulings? The district court's order in this case said that it most clearly, the result that the district court reached was most clearly relied upon by the FBI documents. These documents provide absolutely zero opportunity for cross-examination and investigation. If those documents are removed from the case, there is no way that the district court's order can stand. Mr. Brocklin cites correctly that the district court relied upon other bits of evidence. However, none of that evidence would support the findings that the district court made. The district court judge, I know judges are supposed to be able to sort of weed through the problems, but in this particular case, it's clear that the court was tainted by the FBI documents. So your answer to my question is that the importance that those documents play in the case is what determines whether there's an abusive discretion? It will. In other words, the other evidence can't do the work. I'm sorry, Your Honor, for interrupting you. The other evidence cannot. In fact, the other evidence points to communications made to people that were not Mr. Solomon. Telephone calls made to a Circle Gallery of which he was a mere shareholder. Telephone calls made to other cities where he didn't live. Reliance made by other people made a call to an FBI agent who never followed up with Mr. Solomon. That type of evidence would definitely not be sufficient enough. And it also ties in then to the statute of limitations issue and the latches argument that you've raised, Judge McKeon, in question to Mr. Brocklin. But even the FBI for 20 years did not know the significance of these documents because in 2005, this criminal investigation was still open. It was not a closed case as these teletypes suggested back in 1988. So for 20 years, FBI didn't know what to do with it. How would a gentleman like Mr. Solomon know what to do with it? But this district court didn't make a finding on latches, and so we need to go back, and if we look at the Guggenheim case out of New York, which we believe is a law that should apply, that's an issue that the court reserved back for the trial court. It said, let's go back and see if latches does apply. That would be the end. I appreciate your argument. I use my last three minutes to just address the intentional tort issue one more time. The question, I believe, really becomes how far is someone allowed to go? And I believe that Art Loss Register went too far in this case, and they committed an intentional tort as a result. They are. What are the special damages? The special damages, Your Honor, we believe are in the attorney's fees, and frankly, I think the court made a proper inference in assuming that Ms. Cutler had incurred attorney's fees because her attorney was dealing with Art Loss Register, was dealing with Spielberg's counsel, was dealing with the FBI, where the court erred was in saying that she incurred those fees, quote, only because she chose to sue for intentional tort. What evidence do you have that would refute opposing counsel's statement that by the time the general counsel in this case made the allegedly tortious statement that the matter had been fully resolved with the FBI? I think there were several statements made by Mr. Maranello, and they're in the record, that were made over the course of many weeks, and that some of those were made before the FBI ever finally signed off on everything. And even if the FBI signed off on it at some point, Mr. Maranello had said, we can see that, we can make sure that an FBI investigation continues. And if you look at the letter that Mr. Maranello wrote in that same timeframe, they purport to be this entity that works closely with the FBI. In fact, in Maranello's letter to Spielberg, that he directed to Spielberg's counsel, he says, we operate closely with the FBI throughout the world in a coordinated effort to reduce the trade of stolen art. And then he goes on to say, and we have established that the person who sold you the work, Judy Cutler, did not have the authority to do that. And that is absolutely incorrect, absolutely out of bounds with respect to how far Art Loss Register should be allowed to go in what it was doing with Jack Solomon to try to get this painting back a third time. Thank you. Thank you. Thank all counsel for your argument this morning. The case just argued, Solomon v. Cutler and Art Loss Register is submitted. The court is adjourned.
judges: Brewster, McKeown, Smith